UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

MICHELLE A. LAFRANCE,                                    CIVIL NO.  09-403 (JNE/JSM)

       Plaintiff,

v.                                                      REPORT AND RECOMMENDATION

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.

The above matter is before the undersigned United States Magistrate Judge on plaintiff's Motion for Summary Judgment [Docket No. 9] and defendant's Motion for Summary Judgment [Docket No. 13].  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

## I.    FACTUAL BACKGROUND

Plaintiff Michelle LaFrance ("LaFrance") applied for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416, 423, on August 23, 2005.  Tr. 78.  LaFrance claimed she became disabled as of October 25, 2002.  Id.  At the April 4, 2007 hearing before the ALJ, LaFrance amended her alleged onset of disability to July 5, 2006.  Tr. 16, 481, 488.  LaFrance alleges that the conditions that limit her ability to work included: back injury; muscle spasms in lower back and buttocks; chronic pain; depression; interrupted sleep; difficulty sitting and standing; chronic pain in feet, legs and back; and muscles spasms in upper back, neck and arms.  Tr. 85-86.

The Social Security Administration ("SSA") denied LaFrance's application initially and upon reconsideration.  Tr. 30-38, 42-45.  LaFrance filed a request for a hearing and

on April 4, 2007, and a hearing was held before Administrative Law Judge ("ALJ") Lyle Olsen. Tr. 16, 48. Testimony was taken at the hearing from LaFrance, neutral vocational expert ("VE") Warren Haagenson, and neutral medical expert ("ME") Steven Carter. Tr. 477. On October 29, 2007, the ALJ issued a decision unfavorable to LaFrance. Tr. 16-29. The SSA Council denied a request for further review. Tr. 7-9. The denial of review made the ALJ's findings final. 42 U.S.C. § 405(g); Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992); 20 C.F.R. § 416.1481.

LaFrance sought review of the ALJ's decision by filing a Complaint with this Court pursuant to 42 U.S.C. § 405(g). The matter is now before the Court on plaintiff's Motion for Summary Judgment [Docket No. 9] and defendant's Motion for Summary Judgment. [Docket No. 13].

## II.    PROCESS FOR REVIEW

Congress prescribed the standards by which Social Security disability benefits may be awarded: "[t]he Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability." 42 U.S.C. § 1382(a); Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992). The Social Security Administration shall find a person disabled if the claimant "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 1382c(a)(3)(A). The claimant's impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B). The impairment must last for a continuous period of at least twelve

months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A); <u>see also</u> 20 C.F.R. §§ 404.1509, 416.909.

### A.    Administrative Law Judge Hearing's Five-Step Analysis

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision.  20 C.F.R. §§ 404.909(a)(1), 416.1409(a).  A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ.  42 U.S.C. §§ 405(b)(1), 1383(c)(1); 20 C.F.R. §§ 404.929, 416.1429, 422.201 <u>et seq</u>.  To determine the existence and extent of a claimant's disability, the ALJ must follow a five-step sequential analysis, requiring the ALJ to make a series of factual findings regarding the claimant's work history, impairment, residual functional capacity, past work, age, education, and work experience.  <u>See</u> 20 C.F.R. §§ 404.1520, 416.920; <u>see also</u> <u>Locher</u>, 968 F.2d at 727.  The Eighth Circuit described this five-step process in <u>Morse v. Shalala</u>, 16 F.3d 865, 871 (8th Cir. 1994), <u>vacated on other grounds</u>, as follows:

> The first step asks if the claimant is currently engaged in substantial gainful employment.  If so, the claimant is not disabled.  If not, the second step inquires if the claimant has an impairment or combination of impairments that significantly limits the ability to do basic work activities.  If not, the claimant is not disabled.  If so, the third step is whether the impairments meet or equal a listed impairment; if they do, the claimant is disabled.  The fourth step asks if the claimant's impairments prevent her from doing past relevant work.  If the claimant can perform past relevant work, she is not disabled.  The fifth step involves the question of whether the claimant's impairments prevent her from doing other work.  If so, the claimant is disabled.

(citing 20 C.F.R. § 416.920).

**B.**     **Appeals Council Review**

If a claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, though review is not automatic. 20 C.F.R. §§ 404.967-404.982, 416.1467-416.1482. The decision of the Appeals Council, or of the ALJ if the request for review is denied, is final and binding upon a claimant unless the matter is appealed to Federal District Court within 60 days of notice of the Appeals Council's action. 42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

**C.**     **Judicial Review**

Judicial review of the ALJ's decision generally proceeds by considering the decision of the ALJ at each of the five steps. The Court is required to review the administrative record as a whole and consider:

     1.      The credibility findings made by the ALJ.

     2.      The plaintiff's vocational factors.

     3.      The medical evidence from treating and consulting physicians.

     4.      The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

     5.      Any corroboration by third parties of plaintiff's impairments.

     6.      The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth plaintiff's impairments.

Cruse v. Bowen, 867 F.2d 1183, 1185 (8th Cir. 1989) (citing Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir. 1980)).

The review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008); Johnson v. Apfel, 210

F.3d 870, 874 (8th Cir. 2000); Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996). "We may reverse and remand findings of the Commissioner only when such findings are not supported by substantial evidence on the record as a whole." Buckner v. Apfel, 213 F.3d 1006, 1012 (8th Cir. 2000) (citation omitted).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison v. NLRB, 305 U.S. 197, 229 (1938)); see also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). "'Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.'" Buckner, 213 F.3d at 1012 (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)); see also Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009) (citing Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)) (same); Cox v. Apfel, 160 F.3d 1203, 1206-07 (8th Cir. 1998) (same).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ. See Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). "It is not my job to decide the facts anew, reweigh the evidence, or substitute my judgment for that of the Commissioner. In this regard, I 'must consider both evidence that supports and evidence that detracts from the Secretary's decision, but may not reverse merely because substantial evidence exists for the opposite decision.'" Callison v. Callahan, 985 F. Supp. 1182, 1186 (D. Neb. 1997) (citations omitted).

The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. Culbertson, 30 F.3d at 939. The Court should not reverse the

Commissioner's finding merely because evidence may exist to support the opposite conclusion. INS v. Elias-Zacarias, 502 U.S. 478, 481 n. 1 (1992); Buckner, 213 F.3d at 1011; Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994). Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Apfel, 811 F.2d 1195, 1199 (8th Cir. 1987); see also Heino v. Astrue, 578 F.3d 873, 878 (8th Cir. 2009) (quoting Jackson v. Bowen, 873 F.2d 1111, 1113 (8th Cir. 1989)) (same).

A claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act. See 20 C.F.R. §§ 404.1512(a), 416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991). Once a claimant has demonstrated that he or she cannot perform prior work due to a disability, the burden of proof shifts to the Commissioner to show that the claimant can engage in some other substantial, gainful activity. See Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004); Martonik v. Heckler, 773 F.2d 236, 238 (8th Cir. 1985).

III.   DECISION UNDER REVIEW

A.   **Vocational Background**

LaFrance was 50 years old at the amended onset of her disability. Tr. 16, 78. She graduated from high school in 1974, and has also taken real estate and computer classes at a college. Tr. 91-92. LaFrance has worked in the past as a customer service manager and an accounts receivable clerk. Tr. 147.

B.    **ALJ's Findings of Fact**

The ALJ concluded that LaFrance was not entitled to Disability Insurance Benefits under §§ 216(i) and 223 of the Social Security Act. Tr. 29. The ALJ based this decision on the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2.    The claimant has not engaged in substantial gainful activity since June 5, 2006, the amended alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3.    The claimant has the following severe impairments: Raynuad's syndrome;[1] low back pain with an underlying history of a low grade retrolistheseis at L4 and L5; status post transitional lumbrosacral transverse process resection, bilateral; and major depression, recurrent. (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a range of light work. The claimant can lift and/or carry 20 pounds occasionally and 10 pounds frequently. The claimant can stand and/or walk (with normal breaks) for a total of about 6 hours in an 8 hour work day, sit (with normal breaks) for a total of about 6 hours in an 8 hour work day, climb ramps and stairs and balance on a frequent basis. The claimant can stoop, kneel, crouch, crawl and climb ladders, ropes and scaffolds on an occasional basis. The claimant must avoid concentrated exposure to extreme cold. From a mental standpoint, the claimant retains sufficient mental capacity to concentrate on, understand, remember and carry out routine, repetitive 3 to 4 step and limited detailed instructions, interact with coworkers on a brief and superficial basis, and interact with the public on a brief, infrequent and superficial basis. The claimant's ability

---

[1]    Raynaud's Syndrome: "Idiopathic paroxysmal bilateral cyanosis of the digits due to arterial and arterial contraction; caused by cold or emotion." STEDMAN'S MEDICAL DICTIONARY (2000).

to handle supervision would be restricted secondary to reduced stress tolerance but adequate to cope with reasonable supportive supervisory styles that could be expected to be found in many customary work settings. Although the claimant's ability to handle stress and pressure in the work place would be somewhat reduced, it would be adequate to tolerate the routine stresses of a routine repetitive and 3-4 step or limited detailed work setting.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565). The claimant has past relevant work. However, the mental limitations noted above would preclude the claimant's past work. Accordingly, the claimant is unable to perform past relevant work.

7. The claimant was born on June 5, 1956 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 25, 2002 through the date of this decision (20 CFR 404.1520(g)).

Tr. 16-29.

## C.     ALJ's Application of the Five-Step Process

The ALJ made the following determinations under the five-step procedure.  At the

first step, the ALJ concluded that LaFrance had not engaged in substantial gainful

activity since the alleged onset of disability.  At the second step, the ALJ found that

LaFrance's Raynuad's Syndrome, lower back pain with an underlying history of a low grade retrolistheseis at L4 and L5, status post transitional lumbrosacral transverse process resection, bilateral, and major depression, recurrent, were severe impairments. At the third step, the ALJ determined that LaFrance's impairments did not meet or equal the requirements of the Listing of Impairments in Appendix 1, Subpart P, Regulation No. 4. At the fourth step, the ALJ found that transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supported a finding that the claimant is "not disabled," whether or not the claimant had transferable job skills. At the fifth step, the ALJ determined there were jobs that exist in significant numbers in the national economy that LaFrance could perform.

## IV. ISSUES UNDER REVIEW

The ALJ determined that LaFrance maintained the following residual functional capacity ("RFC"):

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a range of light work. The claimant can lift and/or carry 20 pounds occasionally and 10 pounds frequently. The claimant can stand and/or walk (with normal breaks) for a total of about 6 hours in an 8 hour work day, sit (with normal breaks) for a total of about 6 hours in an 8 hour work day, climb ramps and stairs and balance on a frequent basis. The claimant can stoop, kneel, crouch, crawl and climb ladders, ropes and scaffolds on an occasional basis. The claimant must avoid concentrated exposure to extreme cold. From a mental standpoint, the claimant retains sufficient mental capacity to concentrate on, understand, remember and carry out routine, repetitive 3 to 4 step and limited detailed instructions, interact with coworkers on a brief and superficial basis, and interact with the public on a brief, infrequent and superficial basis. The claimant's ability to handle supervision would be restricted secondary to reduced stress tolerance but adequate to cope with reasonable supportive supervisory styles that could be

> expected to be found in many customary work settings. Although the claimant's ability to handle stress and pressure in the work place would be somewhat reduced, it would be adequate to tolerate the routine stresses of a routine repetitive and 3-4 step or limited detailed work setting.

Tr. 23.

LaFrance challenged this RFC determination only as it related to the ALJ's determination of her physical RFC; in particular, she contested his finding that she can stand or walk (with normal breaks) for a total of about 6 hours in an 8 hour work day. See Plaintiff's Memorandum of Law in Support of Summary Judgment ("Pl.'s Mem.") at p. 10. LaFrance asserted the ALJ erred in relying only on the opinion of Dr. Greg Salmi, a non-treating, non-examining state agency physician, to deny her benefits, when the evidence in the record, including the March 22, 2007 functional capacity evaluation ("FCE") performed at the Mayo Clinic, showed that LaFrance's had condition deteriorated after Dr. Salmi's report. Id. at pp. 12-13. In addition, LaFrance contended that the ALJ erred by discounting the FCE based on her alleged failure to follow prescribed treatment, where the ALJ had failed to identify a prescribed regimen of exercise or any medical sources noting LaFrance's failure to follow prescribed treatment, as required by Social Security Regulation ("SSR") 82-59. Id. at pp. 14-15. Finally, LaFrance argued that the ALJ's hypothetical to the VE was improper as it was based on an RFC that was not supported by substantial evidence.[2] Id. at pp. 15-16.

---

[2] LaFrance did not argue in her submission to the Court that the RFC, as it related to her mental health, was not supported by substantial evidence in the record, or that the ALJ failed to give her subjective complaints proper weight pursuant to Polaski v. Heckler, 739 F. 2d 1320 (8th Cir. 1984). Therefore, she has waived the right to contest the ALJ's findings with respect to these issues. See Craig v. Apefel, 212 F.3d 433, 437 (8th Cir. 2000); see also Yeazel v. Apfel, 148 F.3d 910, 911-12 (8th Cir. 1998) (citing Roth v. G.D. Searle & Co., 27 F.3d 1303, 1307 (8th Cir. 1994)) (finding failure to raise an issue before this Court results in waiver of that argument).

## V.     PLAINTIFF'S RFC

A claimant's RFC is what he or she can do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1).  The ALJ must determine a claimant's RFC by considering the combination of the claimant's mental and physical impairments.  See Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  It is the claimant's burden, not the Commissioner's, to prove the RFC.  Id. at 1218 (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)).  In determining a claimant's RFC, the ALJ must consider all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his or her limitations.  Id.

The ALJ "bears the primary responsibility for assessing a claimant's [RFC] based on all relevant evidence."   Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000). Nonetheless, the RFC determination must be supported by "medical evidence that addresses claimant's 'ability to function in the workplace.'"  Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003) (quoting Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)).  The ALJ is not limited to consideration of medical evidence, "but is required to consider at least some supporting evidence from a professional."  Baldwin, 439 F.3d at 556 (citing 20 C.F.R. § 404.1545(c)).  If necessary, the ALJ should solicit opinions from claimant's treating physicians, or seek consultative examinations to help assess claimant's RFC.  Nevland, 204 F.3d at 858.

The social security regulations provide that "a treating physician's opinion regarding an applicant's impairment will be granted 'controlling weight,' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (quoting 20 C.F.R.

§ 404.1527(d)(2)) (concluding that the ALJ was correct in not giving controlling weight to a treating physician's opinion where such opinion was unsupported by clinical signs and inconsistent with the physician's own prior evaluations). "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as whole." Pirtle v. Astrue, 479 F.3d 931, 933 (8th Cir. 2007) (quoting Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001)). "An ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001) (citing Prosch, 201 F.3d at 1013).

With these precepts in mind, the Court now proceeds with its analysis of the record as it bears on LaFrance's physical impairments both before and after July 2006.

### A. Medical Record

On January 6, 2004, LaFrance began treatment with the Mayo Clinic's Comprehensive Pain Rehabilitation Center regarding lower back pain that required surgery in 2002 with no realized relief from pain. Tr. 373-375. In the January 24, 2004 discharge instructions from the Comprehensive Pain Rehabilitation Center, it was recommended that LaFrance follow the following guidelines as part of her home exercise routine: range of motion exercises 7 days a week for 20-30 minutes, strengthening exercises 3 days per week, aerobic exercises 3-5 days per week for 20-30 minutes, and mat exercises. Tr. 301.

After her completion of the Comprehensive Pain Rehabilitation Center program, LaFrance underwent an FCE on February 12 and 13, 2004. Tr. 287-90. According to this FCE, LaFrance could lift 20 pounds rarely, lift 15 pounds occasionally, horizontality lift 30 pounds occasionally, and sit, walk and stand "continuously" ("67% to 100% of an

8 Hour Day"). Tr. 288-89. The impression was that LaFrance was "able to do sedentary-light level work (up to 15 pounds occasionally and 20 lbs rarely from floor to waist)." Tr. 289. A work-hardening program was recommended to increase LaFrance's functional level. Id.

LaFrance began her work-hardening program on February 25, 2004. Tr. 283. By May 24, 2004, LaFrance was able to lift and carry 35 pounds on an occasional basis and 45 pounds rarely. Tr. 211. By June 7, 2004, LaFrance had the weight handling abilities to do light-medium level work (up to 30 pounds occasionally and 50 pounds rarely). Tr. 196. LaFrance could continuously bend, squat and stand. Id. Both the physical therapist and treating physician, Robert Yang, M.D. at the Mayo Clinic, found that LaFrance was able to return to work as a customer service manager without restrictions. Tr. 193-94,196.

On August 25, 2004, LaFrance reported to Dr. Marc Myer at the Duluth Clinic the need to take a significant amount of aspirin for her back pain. Tr. 414. On September 8, 2004, LaFrance reported to Dr. Yang that she was having trouble standing due to foot and back pain. Tr. 192. On October 1, 2004, Dr. Russell Gelfman, M.D., with the Mayo Clinic, found that LaFrance was able to go from the sit to stand position with significant pain. Tr. 189-90. Her lumber range of motion was "excellent" with full forward flexion and extension and normal lower strength. Tr. 190. Dr. Gelfman noted some tenderness in the back musculature. Id. Dr. Gelfman found that the only additional limitation he would add to LaFrance's previous FCE was that she be allowed to sit and stand or change positions as needed. Id.

On April 14, 2005, LaFrance reported to Dr. Myer that she had noted "some improvement" with her lower back pain. Tr. 398. However, she also stated that she

stood a great deal during work and still noted severe bilateral heel pain towards the end of the day, which she had always experienced with back pain. Tr. 398. LaFrance stated that she had reduced the amount of aspirin she was taking a day. Id. Dr. Myer's examination showed no distress, a mild to moderate amount of paralumber spinous muscle spasm with no tenderness to palpitation. Id. An examination of her heels revealed no bony abnormality or point tenderness. Tr. 398-99. On September 19, 2005, LaFrance saw Dr. Samantha Crossley, M.D. at the Duluth Clinic regarding her back pain. Tr. 392. Dr. Crossley noted that LaFrance stood independently and sat without difficulty. Id. In addition, Dr. Crossley observed palpable spasm in the cervical and thoracic regions with tenderness. Tr. 392-93.

On November 1, 2005, LaFrance presented to the Mayo Clinic for an evaluation of her back and lower extremity pain. Tr. 185. LaFrance indicated that her back pain was somewhat better than prior to her surgery and that the more significant pain was in both of her heels. Id. She noted that the pain in her heels was concurrent with that of her back pain. Id. Dr. Michael Yazemski, M.D. noted no tenderness upon palpitation of her heels. Id. On the same day, Dr. Todd Patrick, M.D. noted that LaFrance stated that her back was better and that the primary concern was her heel pain, which was exacerbated upon standing. Tr. 186. LaFrance indicated that she was unable to return to work due to prolonged standing. Id. Dr. Patrick found that LaFrance had full range of her lumbar spine and that she did not describe any radiating pain in the lower extremities with any movements. Id. LaFrance's lower extremities demonstrated normal strength. Id. Direct palpitation about the heel and ankle joints, as well as the range of motion of the ankle, did not reproduce any of the pains described by LaFrance. Id. LaFrance was able to walk heel to toe. Id. Dr. Patrick noted that recent spine

imaging demonstrated no acute pathological changes and no instability on flexion and extension beyond what would be expected for a normal physiological range. Tr. 186. Dr. Patrick's impression was that LaFrance's back pain was a minor issue and was under control and could not determine the source of her heel pain. Tr. 187.

On November 16, 2005, Dr. Greg Salmi, M.D., a state agency physician, reviewed LaFrance's medical records and assessed her physical functional capacity for the period of May 15, 2005 to November 16, 2005. Tr. 153-60. Dr. Salmi noted that LaFrance could occasionally lift and carry 20 pounds and frequently lift 10 pounds. Tr. 154. Dr. Salmi also found that LaFrance could stand or walk for about 6 hours in an 8-hour work day, and sit for about 6 hours in an 8-hour work day. Tr. 154. In addition, Dr. Salmi found that LaFrance had the unlimited ability to push and pull. Id. Dr. Salmi based these findings on LaFrance's history of lower back pain, her lumber decompression surgery in 2002, treatment at the Mayo Clinic's pain rehabilitation program in January 2004, and the April 2005 examination that found mild to moderate lower back spasm with no tenderness in palpitation and a normal gait. Id. Dr. Salmi also concluded that LaFrance could climb ramps and stairs and balance frequently, and could climb ladders, stoop, kneel, crouch and crawl on an occasional basis. Tr. 155. Dr. Salmi found no manipulative, visual, communicative or environmental limitations. Tr. 156-57. Dr. Salmi also noted that there were no treating source statements in the reviewed file regarding LaFrance's physical capabilities. Tr. 159.

On December 21, 2005, LaFrance saw Dr. Martin Ellman at the Mayo Clinic regarding her bilateral heel pain. Tr. 182. LaFrance described the pain in her heels as being a throbbing and arching type of pain in the bottoms and backs of her heels. Id. She noted that when her back felt better her heels also felt better. Id. She also stated

to Dr. Martin that when she first got up in the morning, her heels did not hurt, but that after 15 minutes the pain started and increased with further walking. Id. Treatment for her feet included use of supportive low heel shoes with arch support, gel inserts, and some foot stretching. Id. Dr. Ellman noted that LaFrance's foot strength and joint range were normal. Tr. 183. No pain was exhibited on joint range of motion. Id. Very mild pain was noted in the palpitation of the heels with no evidence of redness or swelling. Id. X-rays of LaFrance's feet and ankles were negative and Dr. Ellman was uncertain as to the etiology of her heel pain, as the pain seemed related to her back and there were no biomechanical or radiographic abnormalities found. Id.

On December 22, 2005, LaFrance saw Dr. Yazemski at the Mayo Clinic for an evaluation of her back and leg pain. Tr. 179. LaFrance indicated that her back pain was somewhat better than prior to her surgery but that she still experienced lower back pain. Id. Dr. Yazemski recommended injections in the area of pain and LaFrance indicated that she would consider this option. Id. Dr. Yazemski diagnosed LaFrance with low back pain. Id.

On February 28, 2006, LaFrance presented herself to Dr. Crossley at the Duluth Clinic, with her chief complaint being chronic back pain. Tr. 434. LaFrance indicated that she tried to go back to work at a convenience store, but that the requirements of standing, vacuuming, mopping and other requirements were too painful. Id. LaFrance stated she was continuing to do home physical therapy but she did not feel that she would benefit from further formal physical therapy. Id. After noting her weight, blood pressure, and general observation that she "is a well-developed 49-year old," Dr. Crossley noted that LaFrance was able to get up and down the chair without difficulty, she was in no acute distress, and that "[n]o further exam is done today." Id. Dr.

Crossley's assessment was that LaFrance was suffering from chronic back pain and that it made sense for her "to modify her activities." Tr. 435. Dr. Crossley also opined that she did not know of any reason why she could not work at "some job," but that one that required a great deal of standing or pushing was not ideal. Tr. 435. Dr. Crossley encouraged LaFrance "to continue to look for things she [could] do more comfortably without disrupting her back pain." Tr. 435.

On April 28, 2006, Dr. Crossley filled out a form titled "Medical Opinion Re: Ability to do Work-Related Activities (Physical)" regarding LaFrance. Tr. 419-21. Dr. Crossley found that LaFrance had the maximum ability to carry 10 pounds on an occasional basis, and less than 10 pounds on a frequent basis. Tr. 419. In addition, Dr. Crossley opined that LaFrance could stand and walk for about 2 hours during an 8-hour work day and sit less than 2 hours out of an 8-hour work day. Id. Dr. Crossley also opined that LaFrance could never twist or bend and could only occasionally crouch, climb chairs, climb ladders, neck rotate and neck flex. Tr. 420. Dr. Crossley based her opinions on unspecified "[b]ehaviors in exam room." Id. Dr. Crossley indicated that LaFrance's impairment affected her ability to reach, push and pull, but did not limit her ability with regards to fine and gross manipulation or feeling. Tr. 421.

On June 7, 2006, Dr. Crossley noted that LaFrance reported that she was no longer working, which helped with her back pain at first, but then the pain returned during the summer when she became more active. Tr. 430. Dr. Crossley indicated that LaFrance was not in any acute distress, but that she moved in a guarded nature and changed positions often. Tr. 431. LaFrance was taking Lortab 5[3] for her pain. Tr. 430. Dr. Crossley's assessment was that LaFrance was suffering from chronic pain with

---

[3]     Lotrab:  "A narcotic and analgesic (pain reliever) combination.  Prescribed for mild to moderate pain."  THE PILL BOOK (2002).

acceptable functioning and that the administered pain control was acceptable with no side effects. Tr. 431. On September 8, 2006, LaFrance saw Dr. Crossley for a follow-up. Tr. 325. LaFrance stated that her pain had been exacerbated with recent activity. Tr. 425. Dr. Crossley indicated that LaFrance's gait was guarded and that she needed to change positions frequently in order for her to be comfortable. Tr. 426. LaFrance was not in any acute stress, her spine was well aligned, showed no tenderness, and demonstrated a normal range of motion. Tr. 426. Dr. Crossley's assessment was that LaFrance was suffering from chronic pain with adequate functioning and that the administered pain control was adequate with no side effects. Id. The primary diagnosis was chronic pain syndrome. Id.

On October 30, 2006, Dr. Crossley saw LaFrance again for a follow-up visit and reported no change in LaFrance's pain pattern. Tr. 445. LaFrance was in no acute distress, displayed normal muscle strength, and a normal gait. Tr. 445. LaFrance's spine appeared normal with some paraspinal muscle tenderness present on the right. Tr. 445-46. Dr. Crossley noted that LaFrance's range of motion displayed a decreased flexion and extension. Tr. 446. Dr. Crossley also noted that she discussed with LaFrance a "refresher" with physical therapy. Tr. 446. LaFrance responded that she would try to get going on her own again, and if she had not done so by the next appointment, she would plan to go back to physical therapy. Id.

On January 3, 2007, LaFrance saw Dr. Crossley with regard to chronic pain. Tr. 440-41. LaFrance noted no change with her pain, except that she experienced some increase in pain due to being overworked during the holidays. Tr. 440. LaFrance appeared to be healthy and not in any acute distress. Id. Dr. Crossley noted that LaFrance was engaging in home relaxation exercises. Id. Dr. Crossley's assessment

was that LaFrance was suffering from chronic pain with adaquate functioning and that the administered pain control was adequate with no side effects. Tr. 441. Dr. Crossley made no changes in LaFrance's treatment plan. Id.

On March 21 and 22, 2007, LaFrance had another FCE performed at the Mayo Clinic Work Rehabilitation Center. Tr. 454.

With regards to lifting from floor to waist, this FCE indicated that LaFrance had the ability to participate in sedentary-light level work, lifting ten pounds occasionally (8% to 32% of an 8-hour work day), and lifting occasionally 5 pounds from her waist to over her head. Tr. 455. It was noted that her floor to waist lifting capabilities were limited by decreased upper and lower extremity strength, as well as the fact that her heart rate had exceeded the 80% of the predicted maximum heart rate. Id. With regards to lifting horizontally, LaFrance had the ability to participate in sedentary-light level work, lifting 15 pounds occasionally. Id. Her ability to lift horizontally was limited by decreased upper extremity strength and the pain she experienced with increased weights and repetitions. Id. LaFrance's ability to push and pull was assessed at up to 20-pounds occasionally at a sedentary-light level. Tr. 455-56. Her push and pull capabilities were limited by decreased upper and lower extremity strength, as well as the fact that her heart rate had exceeded the 80% of the predicted maximum heart rate. Id. Her ability to carry, which was limited by decreased upper extremity strength and pain, was placed at a sedentary-light level, with the ability to carry up to 15-pounds occasionally. Tr. 456.

LaFrance was found to be able to occasionally perform the following tasks: forward bending; rotation while standing; crawling; climbing stairs and ladders; and crouching. Tr. 446-57. LaFrance's ability to bend was limited by decreased trunk strength, an inability to maintain spinal curve, increased pain with increased time and an

increased heart rate; her ability to rotate was limited by decreased trunk strength, increased pain with increased time and an increased heart rate; her ability to crawl was limited by increased pain with increased distance, as well as the need to assist her out of the crawling position; her ability to climb stairs and ladders was limited by lower extremity weakness, increased pain with increased repetitions and the fact that her heart rate had exceeded 90% of the predicted maximum heart rate; and her ability to crouch was limited by decreased lower extremity strength, increased pain, as well as the need to assist her out of the crouching position.  Id.

LaFrance was found to be able to frequently (34%-66% out of an 8-hour day) perform elevated work and kneeling.  Tr. 456.  Her ability to perform elevated work was limited by decreased upper extremity strength and endurance, and her ability to kneel was limited by the need to assist her out of the position.  Id.

The FCE concluded that LaFrance was able to stand for 8-32% of a work day and sit for 34-66% of a workday.  Tr. 457.  Her ability to stand was limited by decreased trunk endurance, decreased lower extremity strength, increased pain, increased postural shifting and a fluctuating heart rate.  Id.  The FCE also reported that LaFrance had increased pain and shifting with increased sitting over time.  Id.  In addition, the FCE found that LaFrance had the ability to walk for 34-66% of a workday.  Id.  The FCE reported that LaFrance had increased pain with increased walking.  Id.  LaFrance exhibited no limitations as to balance and coordination.  Id.

The FCE report noted that LaFrance was cooperative as she demonstrated behavior that indicated she was willing to work to her maximum abilities and that her performance was consistent over both days of testing.  Id.

The conclusion of the FCE was that LaFrance's current ability did not match those required for a grocery clerk position. Tr. 458. In addition, her physical abilities were less than demonstrated during the 2004 FCE. Id. The FCE indicated that LaFrance would "benefit from an individual fitness program to maintain and/or increase overall fitness, endurance and strength." Id.

On March 26, 2007, LaFrance saw Dr. Gelfman at the Mayo Clinic to review the FCE results. Tr. 452. Dr. Gelfman noted that he had not seen LaFrance since October 1, 2004 and that LaFrance had experienced back pain problems since 1994. Id. LaFrance informed Dr. Gelfman that since her 2004 FCE and her participation in a work-hardening program, she returned to her grocery position, which she quit after ten weeks because she could not tolerate the job. Id. She then took an accounts receivable position that lasted only for 5 months due to back pain arising out of sitting for prolonged periods; she also had a job as a convenience store clerk, which allowed her to sit and stand, but only lasted in that position for 6-7 weeks because she had to stand too much. Id. LaFrance stated that she continued to have back and heel pain and noted that her pain levels were at best 3 out of 10, and at their worst 7 out of 10. Id. The pain came and went on its own, with a lack of change in positions being problematic. Id. LaFrance's medications included Cymbalta,[4] Wellbutrin,[5] Protonix[6] and Procardia.[7] Id.

---

[4]     Cymbalta (duloxetine) is used to treat depression and anxiety and is in a class of medications called selective serotonin and norepinephrine reuptake inhibitors (SSRIs). See www.nlm.nih.gov/medlineplus/druginfo.

[5]     Wellbutrin (bupropion) is used to treat depression. See www.nlm.nih.gov/medlineplus/druginfo.

[6]     Protonix (pantoprazole) is used to treat gastroesophageal reflux disease. See www.nlm.nih.gov/medlineplus/druginfo.

Dr. Gelfman's examination of LaFrance showed that she changed positions frequently, her gait was normal, although she experienced discomfort with walking on her heels.  Tr. 452.  She exhibited normal strength and reflexes in the upper and lower extremities.  Id.  Palpitation demonstrated tenderness over the suboccipital paraspinal muscles, over the trapezli, the anterior ribs and the lumbrosacral areas.  Tr. 453.  There was no tenderness in her feet.  Id.  LaFrance was diagnosed with chronic low back pain, depression and Raynaud's disease.  Id.  Dr. Gelfman noted that LaFrance's "Functional Capacity Evaluation shows that she lost ground since her previous study, likely due to the fact that she is not exercising regularly.  She now has weight handling capabilities in the sedentary to light work but this is moderated by her decreased tolerance for static work positions of sitting or standing."  Id.[8]

### B.    Daily Activities

In a September 4, 2005 function report prepared by LaFrance, she indicated that during a typical day she would wake up, sit for a while, get dressed or shower, make her bed, rest until about 1:00 p.m., perform chores for short amounts of time (including emptying the dishwasher, cleaning counters, doing a load of laundry, sweeping or mopping, dusting or vacuuming, and taking care of her garden for a few minutes at a time), spend some time on the computer and then rest during the remainder of the day into the evening.  Tr. 121.  She further indicated that she could only spend 15 to 30 minutes at a time on household chores.  Tr. 123.  She did approximately 4 loads of laundry per week, ironed clothing if needed, vacuumed every several weeks, cleaned

---

[7]    Procardia (nifedipine) is used to treat high blood pressure and to control angina. See www.nlm.nih.gov/medlineplus/druginfo.

[8]     This Court notes that the ME only testified as to LaFrance's mental impairments but did not address her physical impairments.  Tr. 519-26.

the kitchen floor every week and cleaned the bathroom once every two weeks.  Id.  She only ate supper and was usually only able to make a sandwich, salad or vegetable.  Id. LaFrance went to the grocery store once a week where she would browse for about an hour and pick up some items on occasion.  Tr. 124.  LaFrance used to enjoy fishing, gardening, traveling, crochet, and reading, but stated that she was limited from engaging in these hobbies as it was hard for her to bend, sit, and do anything with her arms in a forward position or with her head bent down.  Tr. 125.  LaFrance talked frequently on the phone with family and visited with family in town or when they came to town.  Id.  LaFrance noted that she could walk up to 30 minutes but that it was very painful for her to do so.  Tr. 126.  LaFrance also noted that during the summer of 2005, her husband was gone during the work week, and that during this time she maintained the household, the yard work and took care of her one child.  Tr. 128.

In her January 26, 2006 function report, LaFrance stated that she got up at 7:00 a.m. and sat for several hours, did some self-grooming, and on some days spent 15 to 20 minutes doing housework.  Tr. 130.  She indicated that she did not do much around the house and stayed inside of the house for most of the time.  Id.  Although she used to cook on a daily basis and bake, LaFrance only made a tub of soup weekly.  Tr. 132. LaFrance did laundry, vacuumed and filled a dishwasher on a monthly basis, went outside of her home on a weekly basis and was able to drive a car.  Tr. 132-133.  She went grocery shopping on a weekly or biweekly basis.  Id.  LaFrance paid her bills, counted money, handled a savings account, and used a checkbook.  Id.  LaFrance stated that she rarely spent time with others and that she went monthly to visit her parents.  Tr. 134.  LaFrance stated she could not walk more than six blocks before she started to hurt.  Tr. 135.

At the April 4, 2007 hearing, LaFrance indicated that she was taking Lortab for her pain, especially when she traveled. Tr. 496. She watched television and listened to books on tape. Tr. 507-08. She was on the computer for periods of 5 to 20 minutes. Tr. 508. She was able to dress herself, take a shower or bath, make her own bed, take out the garbage in little bags, cook soup once a week or make sandwiches, vacuum once a week for 5 to 10 minutes, wash clothes occasionally, and grow vegetables in a garden. Tr. 509-10. LaFrance testified that she had fished in a boat for two-hour periods for two weeks during the previous summer. Tr. 511. Further, she testified that she could drive her automobile for up to 90 minutes. Id. LaFrance stated she could carry a gallon of milk and a 12-pack of soda. Tr. 494. She also testifed that she could rarely lift up to 10-15 pounds, she could walk between a block and 2 miles depending on the pain in her back, stand for 15-20 minutes at a time, and sit up to 20 minutes at a time. Tr. 511-13. She further testified that she needed to lie down for the entire day for three days a week. Tr. 513.

## C.   ALJ's RFC

As stated previously, the ALJ found that LaFrance had the RFC to perform a light range of work.[9] Tr. 23. This determination included the ability to carry 20 pounds

---

[9]      20 C.F.R. § 416.967(b) states that light work involves:

> [L]ifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional

occasionally and 10 pounds frequently; standing and/or walking (with normal breaks) for a total of about 6 hours in an 8 hour work day; sitting (with normal breaks) for a total of about 6 hours in an 8-hour work day; climbing ramps and stairs and balancing on a frequent basis; and stooping, kneeling, crouching, crawling and climbing ladders, ropes and scaffolds on an occasional basis. Id. The ALJ indicated that the basis for his RFC determination was the opinion of Dr. Salmi, the state agency consultant. Tr. 27. Regarding the timing of Dr. Salmi's opinion (rendered on November 16, 2005), the ALJ stated:

> Although Dr. Salmi's opinion predates the claimant's amended onset date, the undersigned does not find a change in the physical condition is justified by the record. As discussed above, the claimant has had minimal treatment and has only needed her narcotic pain medications on a rare basis. Dr. Salmi's opinion is generally consistent with the record[,] particularly the claimant's activities of daily living.

Tr. 27.

LaFrance asserted that the ALJ erred in relying only on the opinion of Dr. Salmi, a non-treating, non-examining state agency physician, to deny her benefits, when the opinion was authored several months before the onset of her disability and the evidence in the record, including the March 22, 2007 FCE performed at the Mayo Clinic, showed that LaFrance's condition had deteriorated after Dr. Salmi's report. See Pl.'s Mem. at pp. 12-13. The Government countered that LaFrance's report of her daily activities and her medical records were consistent with Dr. Salmi's opinion and therefore, the ALJ's conclusion was supported by substantial evidence. See Defendant's Memorandum in Support of Motion for Summary Judgment ("Def.'s Mem.") at pp. 11-14.

---

limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

This Court finds that the ALJ's determination of LaFrance's RFC was not supported by substantial evidence on the record as a whole, and that this case should be remanded back to the Commissioner for further proceedings.  As an initial matter, the Court observes that the ALJ cannot determine LaFrance's RFC without a medical opinion to support that assessment.  See Lauer v. Apfel, 245 F.3d 700, 703-04 (8th Cir. 2001)

> Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence," Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir.2000), we have also stated that a "claimant's residual functional capacity is a medical question," Singh, 222 F.3d at 451. "[S]ome medical evidence," Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir.2000) (per curiam), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace," Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir.2000).

Id.; see also Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002) (quoting Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001), quoting Lauer, 245 F.3d at 704).  Here, the only "basis" for the determination of the RFC for LaFrance was the November 16, 2005 report by Dr. Salmi who reviewed LaFrance's medical records and assessed her physical RFC for the period of May 15, 2005 to November 16, 2005.  Tr. 153-60.

The ALJ's reliance on Dr. Salmi's opinions as the sole medical basis for his RFC determination was improper.  First, the "opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998) (citing Metz v. Shalala, 49 F.3d 374, 377 (8th Cir. 1995)); see also Nevland, 204 F.3d at 858 ("The ALJ relied on the opinions of non-treating, non-examining physicians who reviewed the reports of the treating

physicians to form an opinion of Nevland's RFC.  In our opinion, this does not satisfy the ALJ's duty to fully and fairly develop the record. The opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole.") (citing Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir. 1999)).

Second, while an "ALJ may consider all evidence of record, including medical records and opinions dated prior to the alleged onset date, when there is no evidence of deterioration or progression of symptoms," (Pirtle, 479 F.3d at 934 (citing Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005)), in this case, the ALJ relied on an opinion rendered eight months before the alleged onset of disability, which given its timing, could not consider the subsequent medical records indicating a worsening of LaFrance's symptoms and functionality.  As stated previously, Dr. Salmi opined that LaFrance could occasionally lift and carry 20 pounds and frequently lift 10 pounds in an 8-hour work day, and could stand and walk for 6 hours and sit for about 6 hours in an 8-hour work day.  Tr. 154.  In contrast, the FCE performed in March 2007, at the Mayo Clinic Work Rehabilitation Center provided that LaFrance exhibited a decrease in upper and lower extremity strength and endurance, a decrease in trunk strength and endurance, and increased pain (and in some cases a higher than expected heart rate) with increased time at an activity.  Tr. 455-57.  Based on these findings, the FCE indicated with regards to lifting from floor to waist, that LaFrance had the ability to participate in sedentary-light level work lifting up to 10 pounds occasionally (8% to 32% of an 8-hour work day), occasionally lifting 5 pounds from her waist to over her head, and the ability to carry up to 15-pounds occasionally.  Tr. 455-456.  As to her ability to stand, the 2007 FCE concluded that LaFrance could stand for 8-32% of a work day, which at maximum is a little over 2 1/2 hours in an 8-hour work day, and sit for 34-66%

of a work day, which translates to approximately almost 2 3/4 hours at the low end and a little over 5 hours at the high end in an 8-hour work day.  Tr. 457.  In addition, the FCE stated that LaFrance had the ability to walk for 34-66% of a workday, or approximately 2 3/4 hours to 5 hours in an 8-hour day.  Id.  On March 26, 2007, Dr. Gelfman reported tenderness in LaFrance's back, observed her shifting positions often while sitting and that she had pain while walking on her heels.  Tr. 452.  Dr. Gelfman also noted that LaFrance's FCE showed that she had lost ground since her previous study, and that she "had the weight handling capabilities in the sedentary to light work range but this is moderated by her decreased tolerance for static work positions of sitting or standing."[10]  Id.

Given Dr. Salmi did not examine LaFrance, and did not have the benefit of the records generated after November 2005, and in particular, the FCE obtained in March 2007, his opinions should not have been accorded substantial weight.  Id.  See Lauer, 245 F.3d at 705; Frankl v. Shalala, 47 F.3d 935, 938 (8th Cir. 1995) (finding that RFC forms prepared by a consulting, non-examining, physician "cannot constitute substantial

_____

[10]     The Court notes that LaFrance also pointed to evidence from her treating physician, Dr. Crossley.  See Pl.'s Mem. at p. 13.  Indeed, Dr. Crossley opined in a April 28, 2006 form titled "Medical Opinion Re: Ability to do Work-Related Activities (Physical)" that LaFrance had the maximum ability to carry 10 pounds on an occasional basis and less than 10 pounds on a frequent basis.  Tr. 419.  In addition, Dr. Crossley opined that LaFrance could stand and walk for about 2 hours during an 8-hour work day and sit less than 2 hours out of an 8-hour work day.  Id.  Dr. Crossley based her opinions on unspecified "[b]ehaviors in exam room."  Tr. 420.  However, circling the level of LaFrance's abilities on a form sheet, with no specific reasons for doing so, does not entitle her opinion to greater deference than any other physician's opinion merely because she a treating physician.  See Metz v. Shalala, 49 F.3d 374, 377 (8th Cir. 1995) (treating physician's conclusory statements not entitled to greater deference than any other physician's opinion, and when a treating physician's statements are conclusory).  Further, at the point that Dr. Crossley filed out this form, she had only seen LaFrance twice (on September 19, 1005 and February 28, 2006) and no examination was performed of LaFrance at the February 2006 appointment.  Tr. 392-93, 434-35.

evidence that [claimant] was capable of performing the full range of light work . . . because the opinions in these agency RFC assessment forms . . . were not based upon the full record in this case.").  While the ALJ did not have to accept the 2007 FCE report at face value, he could not reject this report on critical functionality issues, (namely the capacity to sit, and stand and walk for a period of time), and base his RFC assessment solely on the contrary opinion of a non-examining physician.  <u>Jenkins</u>, 196 F.3d at 925 ("There is no other evidence in the record to support the ALJ's residual-functional-capacity finding besides the non-treating physician's assessment.  This assessment alone cannot be considered substantial evidence in the face of the conflicting assessment of a treating physician.")

Third, to the extent that the ALJ discounted the 2007 FCE because of LaFrance's "noncompliance issues," (Tr. 27), the ALJ made inferences from the record that he was not allowed to do.  In reviewing the results of the 2007 FCE, Dr. Gelfman stated that LaFrance "lost ground since her previous study, likely due to the fact that she is not exercising regularly."  Tr. 453.  Based on this statement, the ALJ refused to give the FCE any weight.  Tr. 27.  In support of the ALJ's determination, the Commissioner argued that the ALJ was allowed to infer from Dr. Gelman's statement that LaFrance would have had a higher RFC had she exercised.  <u>See</u> Def.'s Mem. at p. 16.  This argument is contrary to the law.  "'[A]n administrative law judge may not draw upon his own inferences from medical reports.'"  <u>Shontos v. Barnhart</u>, 328 F.3d 418, 427 (8th Cir. 2003) (quoting <u>Lund v. Weinberger</u>, 520 F.2d 782, 785 (8th Cir. 1975)); <u>see also</u> <u>Nevland</u>, 204 F.3d at 858 (citing <u>Landess v. Weinberger</u>, 490 F.2d 1187, 1189 (8th Cir. 1974); <u>Willem v. Richardson</u>, 490 F.2d 1247, 1248-49 n. 3 (8th Cir. 1974)) ("An administrative law judge may not draw upon his own inferences from medical reports.").

The 2007 FCE contradicted the RFC posed by the ALJ, and the ALJ was not permitted to infer an RFC based on his lay person's belief as to what it should have been had LaFrance exercised.[11]

Fourth, although the ALJ found that the RFC reached by Dr. Salmi was consistent with LaFrance's daily activities of living (Tr. 27), the fact that LaFrance was able to engage in certain daily activities does not in of itself constitute substantial evidence that she had the functional capacity to engage in gainful activity. Singh v. Apfel, 222 F.3d 448, 453 (8th Cir. 2000) ("This court has repeatedly stated that a person's ability to engage in personal activities such as cooking, cleaning or a hobby does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity.") (citation omitted).

Further, none of the activities upon which the ALJ relied upon for the RFC support a finding that LaFrance was able to occasionally lift and carry 20 pounds and frequently lift 10 pounds or stand, walk or sit for six hours in an 8-hour workday. For example, the ALJ's emphasis on the fact that LaFrance could sit for 1 1/2 hours to drive to see her husband every week, (Tr. 25-26), does not lead to the conclusion that LaFrance had the ability to sit for 6 hours. Similarly, an ability to lift a gallon of milk[12] or a 12-pack of soda, which the Commissioner argued LaFrance could do following her

---

[11]    LaFrance argued that the ALJ erred by discounting the 2007 FCE due to "non-compliance issues" because the ALJ failed to identify evidence in the record showing a prescribed regimen of exercise or any medical sources noting LaFrance's failure to follow prescribed treatment, in accordance with the SSR 82-59. See Pl.'s Mem. at pp. 14-15. However, SSR 82-59 is not applicable to this case in its present procedural posture, as the ALJ never concluded that LaFrance was disabled under the Act. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001); see discussion regarding SSR 82-59, infra.

[12]    According to the Dictionary of Units of Measurements, http://www.unc.edu/~rowlett/ units/dictG.html, a gallon of liquid weighs approximately 8.33 pounds.

surgery in 2002, (Def.'s Mem. at p. 11), does not indicate that she could occasionally lift and carry 20 pounds and frequently lift 10 pounds.

In sum, the RFC developed by the ALJ was not based on substantial evidence in the record as a whole where LaFrance's condition had deteriorated since Dr. Salmi's report. Additionally, the RFC was not based on any medical opinion by a provider after the onset of disability, but was instead based on improper inferences drawn from the medical record and from LaFrance's daily activities.

For all of these reasons, this Court concludes that the ALJ's decision to deny plaintiff disability benefits is not supported by substantial evidence in the record as a whole. The Court further concludes that a remand is appropriate where as here, the ALJ's factual findings, considered in light of the record as a whole, "are insufficient to permit this Court to conclude that substantial evidence supports the Commissioner's decision." See Scott ex rel. Scott v. Astrue, 529 F.3d 818, 822 (8th Cir. 2008) (citations omitted). Therefore, it is recommended that LaFrance's motion for summary judgment be granted and the ALJ's decision be vacated. It is also recommended that the defendant's motion for summary judgment be denied.

On remand, the ALJ should be directed to properly assess the appropriate weight to be given to the medical records generated after LaFrance's date of onset, and in particular the 2007 FCE report, in order to determine the RFC for LaFrance. To the extent that the ALJ concludes that the 2007 FCE should not be given substantial weight, he shall then contact LaFrance's treating physicians for "'additional evidence or clarification,' and for an assessment of how the 'impairments limited [LaFrance's] ability to engage in work-related activities.'" See Bowman v. Barnhart, 310 F.3d 1080, 1085 (8th Cir. 2002) (quoting 20 C.F.R. § 404.1512(e); Lauer, 245 F.3d at 706). Alternatively,

the ALJ may request additional evidence by ordering a consultative examination of LaFrance. See 20 C.F.R. § 404.1512(f) (explaining that the ALJ will order consultative examinations if "the information [the Commissioner] need[s] is not readily available from the records of [the claimant's] medical treatment source, or [the Commissioner] [is] unable to seek clarification from [a] medical source").

If the event that the ALJ does revise his final RFC determination, he should then solicit new testimony through an independent vocational expert to determine whether at steps four and five of the evaluation process LaFrance's impairments prevent her from doing her past relevant work or any other work in the regional or national economy. See Jenkins, 196 F.2d at 925 (where a vocational expert's opinion is predicated on a faulty RFC determination, the ALJ cannot rely on that opinion. Nevland, 204 F.3d. at 858 (same).

Finally, if the ALJ does determine that LaFrance is disabled, but also concludes that this disability is the result of her failure to comply with proscribed treatment,[13] the ALJ may conduct an analysis to determine if LaFrance is ultimately not entitled to disability benefits under SSR 82-59 which provides in relevant part:

---

[13] As discussed, there is a suggestion in the record of non-compliance with treatment recommended by LaFrance's treating physicians. In her January 24, 2004 discharge instructions from the Mayo Clinic's Pain Rehabilitation Center, it was recommended that LaFrance follow the following guidelines as part of her home-going exercise routine: range of motion exercises 7 days a week for 20-30 minutes, strengthening exercises 3 days per week, aerobic exercises 3-5 days per week for 20-30 minutes, and mat exercises. Tr. 301. On October 30, 2006, Dr. Crossley discussed with LaFrance a "refresher" with physical therapy, to which LaFrance responded that she would try to pursue this on her own and if she had not done so by the next appointment, she would plan to return to physical therapy. Tr. 445-46. The March 2007 FCE indicated LaFrance would benefit from a fitness program. Tr. 458. On March 26, 2007, Dr. Gelfman commented on the results of the 2007 FCE that LaFrance had "likely" regressed due to a lack of exercise. Tr. 453.

An individual who would otherwise be found to be under a disability, but who fails without justifiable cause to follow treatment prescribed by a treating source which the Social Security Administration (SSA) determines can be expected to restore the individual's ability to work, cannot by virtue of such "failure" be found to be under a disability. (See discussion below for title XVI "blindness" cases.)

Identifying "Failure" as an Issue

SSA may make a determination that an individual has failed to follow prescribed treatment only where all of the following conditions exist:

1. The evidence establishes that the individual's impairment precludes engaging in any substantial gainful activity (SGA) or, in the case of a disabled widow(er) that the impairment meets or equals the Listing of Impairments in Appendix 1 of Regulations No. 4, Subpart P; and

2. The impairment has lasted or is expected to last for 12 continuous months from onset of disability or is expected to result in death; and

3. Treatment which is clearly expected to restore capacity to engage in any SGA (or gainful activity, as appropriate) has been prescribed by a treating source; and

4. The evidence of record discloses that there has been refusal to follow prescribed treatment.

Where SSA makes a determination of "failure," a determination must also be made as to whether or not failure to follow prescribed treatment is justifiable.

S.S.R. 82-59, 1982 WL 31384, 1975-1982 Soc. Sec. Rep. Serv. 793, 793 (1982).[14]

---

[14] If the ALJ undertakes this analysis, he should be mindful of the procedural safeguards set forth in this regulation, including providing LaFrance with notice that such a determination is being made and giving her an opportunity to provide justifiable cause for failing to follow treatment. S.S.R. 82-59, 1982 WL 31384 at *5.

## VI.    RECOMMENDATION

For the reasons set forth above, this Court finds that the decision by the ALJ to deny plaintiff disability benefits is not supported by substantial evidence on the record as a whole.  THEREFORE, IT IS RECOMMENDED THAT:

1.    Plaintiff's Motion for Summary Judgment [Docket No. 9] be **GRANTED**;

2.    Defendant's Motion for Summary Judgment [Docket No. 13] be **DENIED**; and

3.    The decision of the Administrative Law Judge be vacated and the case be remanded to the Commissioner for further proceedings consistent with this Report and Recommendation.

Dated:        February 3, 2010

s/ *Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **February 17, 2010**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under this Rules shall be limited to 3500 words.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.